IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| GEORGE TORRES | § | |
| | § | |
| vs. | § | Civil Case No. 2:20-cv-21 |
| | § | |
| FCA US, LLC f/k/a CHRYSLER GROUP, LLC, | § | |
| AND RITTGERS' SERVICES, INC. D/B/A | § | |
| GREATSTATE TRANSMISSIONS | § | |

## PLAINTIFF'S AMENDED COMPLAINT

TO THE HONORABLE COURT:

COMES NOW, George Torres, bringing this action against FCA US, LLC f/k/a Chrysler Group, LLC and Rittgers' Services, Inc. d/b/a GreatState Transmissions and would show the Court as follows:

### I.  PARTIES

1.  Plaintiff George Torres is an individual residing in Nueces County, Texas.

2.  Non-Party Chrysler Motors LLC f/k/a Chrysler LLC f/k/a DaimlerChrysler f/k/a DaimlerChrysler Motors Company f/k/a Chrysler Corporation (hereinafter "Chrysler Motors") was a foreign for-profit corporation with its principal place of business in Auburn Hills, Michigan. Chrysler Motors manufactured and sold automobiles through its related subsidiaries and/or operating units, retailer dealers, outlets and authorized dealerships primarily in North America. Chrysler Motors was directly involved in the safety investigation and determinations made as to the motor vehicle safety issues arising from the defective and unreasonably dangerous condition of certain Chrysler brand vehicles it designed, manufactured and distributed for sale to the consuming public, including Plaintiff's 2007 Chrysler 300. Chrysler Motors was actively involved in the developing knowledge of this motor vehicle safety issue held by Chrysler entities such as Chrysler LLC over the last decade, and their actions and/or inactions relating to the public safety hazard.

3.  In 2009, Chrysler Motors LLC f/k/a Chrysler LLC, n/k/a Old Carco ("Old Chrysler") declared bankruptcy and, as part of the Troubled Asset Relief Program (TARP), it received a taxpayer bailout. In an

acquisition approved by the bankruptcy court, FCA purchased certain assets of Chrysler. Initially, FCA attempted to escape all liability for pre- bankruptcy-manufactured Chrysler vehicles that were defective. Under the original Master Transaction Agreement ("MTA") dated April 30, 2009, FCA expressly excluded Products Liability Claims for defects in vehicles manufactured and sold by Old Chrysler before the bankruptcy. Originally, the MTA left no remedy for claimants injured in defective Old Chrysler vehicles manufactured and sold before the Bankruptcy Closing.

4. On June 1, 2009, the United States Bankruptcy Court for the Southern District of New York entered an Order (Main Case Docket No. 3232) (the "Sale Order") approving the sale of substantially all of Old Chrysler's assets to FCA pursuant to the terms of the Master Transaction Agreement (as amended and including all ancillary documents thereto, the "MTA") free and clear of all liens, claims and interests, except for "Assumed Liabilities" (Section 2.08) under the MTA. The sale closed on June 10, 2009.

5. Defendant FCA US, LLC f/k/a CHRYSLER Group, LLC ("CHRYSLER") is a Delaware Limited Liability Company doing business in the State of Texas. As a Limited Liability Company, CHRYSLER is treated as an unassociated entity for subject matter jurisdiction purposes under the Federal Rules of Civil Procedure and the United States Code. Therefore, CHRYSLER shares citizenship with the States of all its members. *Johnson v. Columbia Properties, LP*., 437 F.3rd 894, 897 (9th Cir. 2006)(noting numerous federal circuits who have emphasized this well-established rule). Defendant CHRYSLER is the designer, manufacturer, and marketer of the 2007 Chrysler 300 bearing vin 2C3KA43R97H702674 ("Chrysler 300") that forms the basis of this lawsuit. Defendant is before this court.

6. Defendant RITTGERS' SERVICES, INC. D/B/A GREATSTATE TRANSMISSIONS ("GreatState Transmissions") is a Texas Company at all relevant times registered to do business in Texas and actively conducts business in Texas through its Principal Office located at 3487 S. Padre Island Dr., Corpus Christi, Texas 78415. Defendant may be served with process by serving its registered agent Mark Rittgers located at 958 Crossbill Street, Corpus Christi, Texas 78418.

## II. JURISDICTIONAL FACTS REGARDING DEFENDANT CHRYSLER

7. CHRYSLER manufactured the subject vehicle.

8. CHRYSLER designed the subject vehicle.

9. CHRYSLER placed the subject vehicle in the stream of commerce.

10. The subject vehicle intended to and did end up in Texas.

11. The subject accident occurred in Texas.

12. CHRYSLER places vehicles into the stream of commerce.

13. CHRYSLER knows their vehicles will reach Texas.

14. CHRYSLER serves the Texas vehicle market.

15. CHRYSLER conducts business in Texas.

16. CHRYSLER has employees who live in Texas.

17. CHRYSLER owns property in Texas.

18. CHRYSLER pays taxes in Texas.

19. CHRYSLER has authorized vehicle dealers located in Texas.

20. CHRYSLER has authorized vehicle dealers located in Texas to sell CHRYSLER vehicles to Texas customers.

21. CHRYSLER has authorized vehicle distributors located in Texas.

22. CHRYSLER authorized vehicle distributors located in Texas to sell CHRYSLER vehicles to Texas customers.

23. CHRYSLER advertises their vehicles in Texas.

24. CHRYSLER advertised in Texas from 2002 through 2016.

25. CHRYSLER markets their vehicles in Texas through authorized vehicle distributors.

26. CHRYSLER markets their vehicles in Texas through authorized vehicle dealers.

27. CHRYSLER marketed their vehicles in Texas through authorized vehicle dealers from 2002 through 2016.

28. CHRYSLER marketed their vehicles in Texas through authorized vehicle distributors from 2002 through 2016.

29. CHRYSLER provides warranties for their vehicles in Texas.

30. CHRYSLER provided warranties for their vehicles in Texas from 2002 through 2016.

31. CHRYSLER advertised warranties for their vehicles in Texas from 2002 through 2016.

32. CHRYSLER provided warranties for their Chrysler 300 model vehicles in Texas from 2002 through 2016.

33. CHRYSLER sells their Chrysler 300 model vehicles in Texas.

34. CHRYSLER sold their Chrysler 300 model vehicles in Texas from 2002 through 2016.

35. CHRYSLER delivered their Chrysler 300 model vehicles in Texas to its authorized vehicle distributors in Texas.

36. CHRYSLER delivered Chrysler 300 model vehicles in Texas to its authorized vehicle dealers in Texas.

37. CHRYSLER delivered Chrysler 300 model vehicles in Texas to its authorized vehicle distributors in Texas from 2002 through 2016.

38. CHRYSLER delivered Chrysler 300 model vehicles in Texas to its authorized vehicle dealers in Texas from 2002 through 2016.

39. Chrysler 300 model vehicles are sold in Texas.

40. Chrysler 300 model vehicles were sold in Texas from 2002 through 2016.

41. CHRYSLER sold the defective Chrysler 300 vehicle, bearing Vin # 2C3KA43R97H702674, at issue in this cause of action in the State of Texas.

42. CHRYSLER sold the subject vehicle that had substantial seat design, manufacturing, and warning defects, the subject Chrysler 300 vehicle, bearing Vin #2C3KA43R97H702674, in the State of Texas.

43. CHRYSLER sold the defective Chrysler 300 vehicle, bearing Vin #2C3KA43R97H702674, at issue in this cause of action, in the State of Texas, and said vehicle was purchased in the State of Texas.

44. CHRYSLER sold the defective subject vehicle that contained the catastrophic seat design, manufacturing, and warning defects, the Chrysler 300 vehicle, bearing Vin # 2C3KA43R97H702674, in the State of Texas, and said vehicle was purchased in the State of Texas.

45. CHRYSLER marketed, intended to sell, and sold the defective subject vehicle that contained the catastrophic seat design, manufacturing, and warning defects, the Chrysler 300 vehicle, bearing Vin #2C3KA43R97H702674, in the State of Texas, and said vehicle was purchased in the state of Texas.

46. CHRYSLER from 2002 to 2016 has invoked the jurisdiction of Texas courts.

47. CHRYSLER from 2002 to 2016 has invoked the jurisdiction of federal courts in Texas.

48. CHRYSLER from 2002 to 2016 has filed suit in Texas courts.

49. CHRYSLER from 2002 to 2016 has removed suits to federal courts in Texas.

50. CHRYSLER from 2002 to 2016 has filed court papers asserting that federal courts in Texas have jurisdiction over cases in which CHRYSLER was a party.

51. CHRYSLER from 2002 to 2016 has moved to transfer suits in courts in Texas.

52. CHRYSLER from 2002 to 2016 has filed papers asserting that transferee courts in Texas had jurisdiction over cases in which CHRYSLER was a party.

53. CHRYSLER from 2002 to 2016 has filed petitions or appeals seeking review or relief from Texas appellate courts.

54. CHRYSLER from 2002 to 2016 has filed court papers asserting that Texas appellate courts had jurisdiction over cases in which CHRYSLER was a party.

55. CHRYSLER from 2002 to 2016 has answered lawsuits filed in Texas courts without contesting personal jurisdiction.

56. CHRYSLER is currently involved in litigation other than this case pending in Texas courts.

57. CHRYSLER is currently in litigation in Texas answering claims asserting the failure of CHRYSLER products in Texas where CHRYSLER has not raised any challenge to the Texas court's personal jurisdiction over CHRYSLER in that pending litigation.

58. CHRYSLER has been hauled into court in Texas to answer claims asserting the failure of CHRYSLER products in Texas without raising any challenge to Texas' personal jurisdiction over CHRYSLER.

59. CHRYSLER gathered data in Texas to monitor their vehicles' performance in the State of Texas.

60. CHRYSLER is registered to do business in Texas and has a registered agent for service of legal process in Texas.

61. CHRYSLER holds trademarks that it enforces in Texas.

62. CHRYSLER has contractual agreements with Texas companies to use CHRYSLER trademarks in Texas.

63. CHRYSLER offers services to help dealers located in Texas.

64. CHRYSLER helps dealers located in Texas develop their own public internet website.

65. CHRYSLER allows Texas dealers to subscribe to content about CHRYSLER for products for use on their website.

66. CHRYSLER has disseminated safety recall information through its dealers located in Texas.

67. CHRYSLER owns the website www.CHRYSLER.com.

68. CHRYSLER has ultimate control and authority of their website mentioned above.

69. CHRYSLER's website, mentioned above is accessible in Texas.

70. CHRYSLER has disseminated safety recall information through its website mentioned above in Texas.

71. CHRYSLER sends notice to Texas consumers who have registered their vehicles outside of CHRYSLER's website.

72. CHRYSLER's website mentioned above has a link describing vehicles subject to recall.

73. CHRYSLER's website mentioned above has a link through which Texas consumers may locate and replace CHRYSLER vehicles.

74. CHRYSLER's website mentioned above has a link through which Texas consumers may locate a vehicle dealer.

75. CHRYSLER has issued technical service bulletins to Texas dealers.

76. CHRYSLER has issued technical service bulletins to Texas dealers on a variety of subjects.

77. CHRYSLER's website mentioned above, which is accessible in Texas, has information where Texas consumers can learn about Texas vehicle dealers that sell CHRYSLER vehicles.

78. Based upon the above, this Court has personal jurisdiction over the defendants because they are authorized to and do conduct business in the State of Texas and have sufficient contacts with the State of Texas, both generally and with regard to this specific action, that the exercise of personal jurisdiction over them is proper.

### III. VENUE AND JURISDICTION

79. The Court has subject matter jurisdiction over this civil action under 28 U.S.C. §1332(a)(1) because Plaintiff and Defendant FCA are citizens of different states and the amount in controversy exceeds $75,000.

80. Venue is proper in the Southern District of Texas, Corpus Christi Division under 28 U.S.C. §1391(b)(2) because a substantial part of the events and/or omissions giving rise to this claim occurred in Nueces County, Texas, which is in this district.

## IV. BACKGROUND

81. On July 11, 2019, George Torres was operating a 2007 Chrysler 300 bearing vin 2C3KA43R97H702674 in Corpus Christi, Nueces County, Texas. While traveling down the road, Plaintiff rear-ended a 2011 Honda-CRV stopped at a red light. The driver's airbag deployed and the inflator ruptured in the secondary chamber, sending metal shrapnel into Plaintiff's jaw and eye.

82. As a result of this crash, Plaintiff's jaw was broken and he lost sight in his left-eye.

83. The Subject Chrysler's driver's airbag inflator is a Takata PSDI-4. Based on the vehicle model year, the inflator was manufactured at the Monclova plant in Mexico, with the propellant manufactured at the Moses Lake plant in Washington.



84. The photos of the subject inflator show failure characteristics of a secondary chamber (driver-facing) rupture.

 

**FCA'S KNOWLEDGE THAT THE TAKATA PSDI-4 INFLATOR
PRESENTED A PRESENT DANGER TO MOTORIST**

85. Chrysler employees routinely visited and audited Takata plants at a time when they were displaying significant quality control issues and visited the Monclova plant after it experienced a massive explosion caused by volatile propellant sitting on the plant floor. (pg. 38) In the early 2000s, Chrysler was initially unwilling to purchase the inflators because Chrysler's Production Part Approval Process requirements were not stringent enough. (pg. 42) By 2004, was concerned that its PSDI-4 inflators were showing aggressive ballistics in testing but continued using them. In 2006, Chrysler was frustrated because Takata was unable to prevent flaming issues in the PSDI-5 inflators for intended for Chrysler vehicles. [*NOTE: Chrysler eventually refused to install this inflator in one model because of the testing but continued using Takata airbags in other models*.]

86. In 2007, Chrysler learned that Takata inflators exhibited "anomaly activity," "ballistic shift," and "aggressive behavior." In 2010, an inflator intended for Chrysler ruptured during Process Validation (PV) testing at Monclova. In 2013, the PSDI-4 inflator in a Dodge ruptured, and two inflators experienced deployment deviations in Takata factories.

## FCA'S SORDID HISTORY IN REGARDS TAKATA RECALLS

87. In a November 25, 2014, letter to Sergio Marchionne, then Chairman and CEO of Chrysler Group, NHTSA admonished the company, saying it had "consistently maintained its position at the rear of the pack" with the initial part collection campaigns. Chrysler had not provided a list of affected vehicles until seven weeks after it filed the regional recall Part 573 report and it didn't plan to send customer notifications until at least six months after that. NHTSA's letter also stated:

> Chrysler's delay in notifying customers and taking other actions necessary to address the safety defect identified is unacceptable and exacerbates the risk to motorists' safety. First, unlike some other manufacturers who have more actively participated in these recalls, Chrysler has had a field incident where a fragmenting inflator injured a customer. This demonstrates the real-world potential for death and injury posed by the Takata inflators installed in the recalled Chrysler vehicles. Moreover, Chrysler's decision to delay notification until it has replacement parts deprives its customers of the ability to take their own informed, cautionary measures if they have a car with a potentially defective airbag.

88. In December 2014, Chrysler, under pressure from NHTSA and increased public scrutiny, recalled 2.89 million vehicles nationwide that contained a PSDI-4 inflator, which included the 2007 Chrysler 300. In its recall submission, FCA noted there had recently been four ruptures in PSDI-4 "Beta" inflators (inflators that did not have the manufacturing defects that caused earlier "Alpha" ruptures), including one rupture in a 2007 Chrysler vehicle (which is discussed further below). Despite these ruptures and the growing number of injuries and deaths associated with them, FCA noted "Chrysler has not at this time made a determination of a defect in the subject inflators" but was willing to comply with NHTSA's request that it initiate a recall "out of an abundance of caution and concern for the safety of our customers." Chrysler also reported that it would not be issuing notice to consumers within 60 days as it did not yet have replacements parts.

Further, because replacements were limited for the foreseeable future due to the increased recall volume at that time, Chrysler planned to prioritize notifications in high absolute humidity areas, which included Texas.

89. In May 2015, Takata issued an equipment recall for all PSDI, PSDI-4, and PSDI-4K inflators, including those previously recalled in OEM campaigns. Takata reported that there had been 59 field ruptures and nine testing ruptures of these inflators. Takata noted that the batwing-shaped propellant wafers in the inflators could degrade over time, particularly with long-term exposure to high humidity and temperature cycling. This could result in the wafers releasing excessive gas when ignited, over pressurizing the metal inflator until it ruptured. Later, in Sept. 2016, Orbital ATK, hired by a coalition of automakers, including Chrysler, under The Independent Testing Coalition (an ad-hoc organization that claimed its purpose was to conduct an independent investigation of the technical issues with Takata inflators) concluded the inflators contained design and manufacturing defects that allowed multiple paths for moisture to enter and further degrade the propellant.

90. Within weeks following Takata's recalls, Chrysler announced it was recalling almost 4.1 million vehicles with the defective PSDI-4 inflators. The May 2015 campaign incorporated vehicles previously covered in its 2014 recall (14V817) that included the subject 2007 Chrysler 300, containing a PSDI-4 inflator. Chrysler sent notices to owners in five stages, based on geographical location, and represented to NHTSA that final notification letters for Stage 1, which included 2004-2007 model year vehicles in Florida and other high absolute humidity states, would be mailed between June 8, 2015, and June 19, 2015. The owner notification letters stated:

> The driver airbag inflator housing in your vehicle may rupture, due to excessive internal pressure, during normal airbag deployment events. This condition is more likely to occur if your vehicle has been exposed to high levels of absolute humidity for extended periods of time. An inflator rupture, during airbag deployment events, could result in metal fragments striking and potentially seriously injuring the vehicle

occupants. *The letters do not indicate that the recall is urgent or that death could occur.*

91. Chrysler does not seem to have required that dealers themselves notify customers. In its July 2015 response to NHTSA's inquiry in the Coordinated Remedy Program about the efforts Chrysler planned to undertake to maximize recall completion rates, Chrysler asserted:

92. At this time, FCA US is not yet utilizing Outreach activities to increase recall completion percentage in the involved Takata inflator recalls. At such time that FCA US has a sufficient quantity of parts, FCA US will begin Outreach for these campaigns. As stated in the response to the Special Order [this is not yet publicly available], FCA US employs a number of methods to maximize recall completion rates. These include, but are not limited to, targeted consumer outreach program utilizing a multi-faceted approach that includes traditional postal mail, email, phone contacts through both robo-calls and predictive dialers, creation of general URLs on the subject as well as personal URLs directing the customers into a live person that will facilitate the remedy's completion. We are also working with Urban Science to program and leverage their StreetSmart® tool to identify the specific location of vehicles that have not had their recall remedy completed. We will utilize Mopar and brand mobile apps to push recall notification and reminders to the owner.

93. In March 2016, Chrysler informed dealers through a dealer notice that:

> The FCA Recall Resolution Team will begin contacting customers whose vehicles show that Recall R25 [aka 15V313] is incomplete. Contacts will be prioritized based on the customer's geographic location. The team will be contacting customers in phase 1. The team may contact your dealership as they assist owners in scheduling appointments to have Safety Recall R25 performed. Please ensure your dealership personnel are aware that they may receive calls from the team while this customer outreach initiative is in progress.

94. Chrysler's 2016 Dealer Communication Guide, submitted to NHTSA in 15V313, instructs dealers to simply tell customers the same information provided in the recall notice and to discourage customers from contacting the OEM's Customer Assistance Center "as this will not yield additional customer benefit. On June 3, 2016, Chrysler reportedly sent out follow-up recall notifications to owners who had not yet had the recall completed. *Nonetheless, through June 7, 2019, when NHTSA updated the figures, NHTSA's Takata Completion Rates website page shows that for all priority groups but the first one (where its completion rate is 65%), Chrysler's completion rates were 52% or less.* The subject vehicle falls into Priority Group 1, which includes vehicles MY 2008 or older that have spent time in a high absolute humidity region. July 24, 2015 Fiat Chrysler US LLC and NHTSA signed a Consent Order in which the automaker admitted violating The Safety Act in myriad ways:

> "[F]or failing to adequately remedy defective vehicles within a reasonable time through repair, replacement, or repurchase in the above-cited campaigns; for failing to timely notify owners of vehicle defects; for failing to timely submit copies to NHTSA of communications relating to recalls; and for failing to provide NHTSA with timely, accurate, and complete information relating to vehicle defects and recalls."

95. The charges were levied in 23 FCA recalls over the previous two years. The work the agency did in preparation for the July 2, 2015, Initial Decision hearing that led to the $105 million civil penalty demonstrates that Chrysler had numerous difficulties meeting its recall responsibilities. For example, in the case of the 23 FCA recalls, NHTSA specifically cited five for unreasonable parts delays that exposed consumers to hazardous conditions. In some cases, injuries from crashes occurred while consumers were waiting to have the remedy applied. They concerned tie rod failures, fuel tanks that could fail in a rear- impact crash and a pinion nut failure.

## V. CAUSES OF ACTION AGAINST DEFENDANT CHRYSLER

**A.     Strict Product Liability: Design, Manufacturing, and Warning Defects.**

96.     The vehicle in question was originally designed, manufactured, sold, and/or placed into the stream of commerce by Defendant CHRYSLER.

97.     At the time of the sale of the vehicle in question, Defendant CHRYSLER was in the business of designing, manufacturing, and selling vehicles such as the vehicle in question.

98.     At the time the vehicle in question was designed, manufactured, sold, and/or placed into the stream of commerce by Defendant CHRYSLER, the same was defective and unreasonably dangerous in its design, marketing, and manufacture.  The design and manufacture of the seatbacks and their componentry's of the driver, front passenger, and back passenger seats were defective.

99.     These defective and unreasonably dangerous conditions were a producing cause of the accident as well as the injuries and damages sustained by the Plaintiff in the accident that forms the basis of this lawsuit.

100.    Aside from normal wear and tear, the Subject Vehicle was in the same defective condition at the time of the accident as it was when it left the hands of Defendant CHRYSLER.

101.    The Subject Vehicle was expected to and in fact reached the user or consumer without substantial change in the condition in which it was sold.

102.    Technologically and economically feasible safer alternative designs existed that would have prevented or significantly reduced the risk of injury without substantially impairing the utility of the product.

103.    At the time the Subject Vehicle was marketed, CHRYSLER knew or should have reasonably foreseen the risk of harm of defectively manufactured and/or designed seatbacks contained in the Subject Vehicle.  CHRYSLER should have warned consumers of the dangerous defects contained in the Subject Vehicle, including but not limited to, placing defective airbag inflators in the Subject Vehicle at the time the Subject Vehicle was marketed.  CHRYSLER's failure to warn of the airbag inflators condition rendered the

Subject Vehicle unreasonably dangerous to the Plaintiff and was a producing cause of the Plaintiffs' injuries and damages.

104. At the time of the Plaintiff's significant injuries due to the defects contained in the Subject Vehicle, the Plaintiff was using the Subject Vehicle as intended.

**B.     Negligence.**

105. Defendant CHRYSLER committed unreasonable acts of omission and commission, which collectively and severally, constitute negligence. Among other acts, Defendant CHRYSLER was negligent in the following:

- a. Failing to implement a proper recall of the defective Takata airbag inflator;
- b. Failing to warn consumers and users of the Subject Vehicle of the defective Takata airbag inflator;
- c. Failing to implement proper quality control procedures to ensure that defective airbag inflators were not put into use; and
- d. Failing to use reasonable care in removing and recalling the defective airbag inflator once becoming aware that the inflator was subpar and not robust.

106. Defendant CHRYSLER's negligence was a proximate cause of the accident that formed the basis of this suit as well as the injuries and the damages sustained by the Plaintiffs.

**C.     Inadequate Standards.**

107. Applicable safety standards issued by the Federal Government or any other agency or group, if any, were inadequate to protect the public from unreasonable risks of injury or damage, and Defendant CHRYSLER has withheld or misrepresented information and material relevant to the federal

government's or agency's determination of adequacy of the safety standards or regulations at issue in this action.

## VI. CAUSES OF ACTION AGAINST DEFENDANT RITTGERS SERVICES D/B/A GREATSTATE TRANSMISSION

### A. Negligence of GreatState Transmission.

108. GreatState Transmission had a duty when inspecting the Subject Vehicle to check for all active recalls and ensure that the Subject Vehicle was not subject to any active recall notices.

109. GreatState Transmission failed in this duty by failing to check the free national database to see that the Subject Vehicle was subject to a recall for the dangerous and deadly Takata airbags. GreatState Transmission's failure to exercise ordinary care when inspecting the Subject Vehicle was the proximate cause of the Plaintiff's injuries and damages.

## VII. PLAINTIFF'S DAMAGES

110. Plaintiff re-alleges and incorporates by reference the above paragraphs. Plaintiff has suffered personal injuries, all of which are a result of the incident made the basis of this lawsuit.

111. As a producing, direct and proximate result of the accident, injuries, and damages for which all Defendants are jointly and severally liable, Plaintiff seeks and is entitled to the following damages:

> a. *Personal Injury Damages of George Torres:*
>
> 1. physical pain and mental anguish in the past and future;
> 2. loss of earning capacity in the future;
> 3. loss of wages and earnings in the future;
> 4. disfigurement in the past and future;
> 5. physical impairment in the past and future;
> 6. medical care in the past and future;
> 7. bystander mental anguish in the past and future; and
> 8. all other damages allowed by law and equity.

## VIII. PRE-JUDGMENT AND POST-JUDGMENT INTEREST

112. Plaintiff seeks pre-judgment and post-judgment interest as allowed by law.

## IX. RESERVATION OF RIGHTS

113. Plaintiff reserves the right to prove the amount of damages at trial. Plaintiff reserves the right to amend his Complaint and add additional counts and/or parties as discovery continues.

## X. CONDITIONS PRECEDENT

114. All conditions precedent have been performed or occurred.

## XI. JURY DEMAND

115. Plaintiff timely requests a trial by jury and have tendered the appropriate fee.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that this cause be set for trial before a jury, and that Plaintiff recover judgment of and from the Defendants their actual damages in such amount as the evidence may show and the jury may determine to be proper, together with pre-judgment interest, post-judgment interest, costs of court, and such other and further relief to which he may show himself to be justly entitled.

Respectfully submitted,

By: */s/ David E. Harris*
David E. Harris
Fed ID No. 712461
State Bar No. 24049273
dharris@shhlaw.com
mresendez@shhlaw.com
Louie J. Cook
State Bar No. 24101191
lcook@shhlaw.com
**SICO HOELSCHER HARRIS LLP**
802 N. Carancahua, Ste. 900
Corpus Christi, Texas 78401
Telephone: 361-653-3300
Facsimile: 361-653-3333
**Attorneys for Plaintiff**

## CERTIFICATE OF SERVICE

       The undersigned attorney, as one of the attorneys of record for Plaintiff certifies that a true and correct copy of the foregoing instrument was forwarded to all counsel of record in accordance with the Federal Rules of Civil Procedure on this the 16th day of November, 2020.

                                             */s/ David E. Harris*
                                             David E. Harris